# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00187-COA

**DWAN DIONDRO WAKEFIELD A/K/A DWAN DIONDRO WAKEFIELD, JR.**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2019 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MOLLIE MARIE McMILLIN |
| | ROBERT SHULER SMITH |
| | DWAN WAKEFIELD (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/14/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Madison County Circuit Court jury convicted Dwan Wakefield of accessory after the fact to murder, accessory after the fact to kidnapping, and accessory after the fact to auto theft. The circuit court denied Wakefield's post-trial motion, and Wakefield now appeals.

¶2.     On appeal, Wakefield asserts the following assignments of error: (1) the Madison County Circuit Court lacked jurisdiction over his case; (2) Wakefield's three separate convictions under the same statute violated his right to protection against double jeopardy;

(3) the evidence was insufficient to support the verdicts; (4) the verdicts are against the overwhelming weight of the evidence; (5) the indictment failed to charge an essential element of accessory after the fact; and (6) the circuit court erred in admitting autopsy and crime scene photographs depicting the deceased victim.

¶3.     Finding no error, we affirm Wakefield's convictions and sentences.

**FACTS**

¶4.     At approximately 1:00 a.m. on May 18, 2017, Wakefield drove his aunt's silver Honda coupe to the Kroger grocery store on I-55 in Jackson, Mississippi.  Wakefield's friends Byron McBride and D'Allen Washington were also in the vehicle.  Wakefield planned to meet Charles Amos at Kroger to sell him a small amount of marijuana, so Wakefield pulled into the Kroger parking lot to wait for Amos.

¶5.     Approximately fifteen minutes later, Ebony Archie drove her Toyota Camry into the Kroger parking lot.  Archie's six-year-old son, Kingston Frazier, was asleep in the back seat, so Archie left her vehicle unlocked and the engine running while she went into the store.

¶6.     Wakefield testified that he, McBride, and Washington watched Archie park her Camry and then enter Kroger.  McBride then exited the Honda and walked toward the Camry, and then he returned to the Honda to retrieve some personal items.  According to Wakefield, McBride stated that he planned to steal the Camry.  Video surveillance from the Kroger parking lot showed a man, later identified as McBride, enter Archie's Camry.  The video then showed the Camry and the Honda driving off.

¶7.    A short time later, Archie exited the store and discovered that her car and her son were gone.  Archie immediately sought help from Deputy James Myers with the Hinds County Sheriff's Office (HCSO).  Myers was on duty that night at Kroger, and he testified that at approximately 1:25 a.m., Archie approached him and reported that her car was missing. After unsuccessfully locating Archie's car in the parking lot, Deputy Myers called HSCO dispatchers to get help from the Jackson Police Department (JPD).  Deputy Myers testified that initially, he believed he was only dealing with a stolen car.  Deputy Myers explained that Archie was very upset, and when she was able to calm down, Deputy Myers then learned that Archie's child was in the stolen car.

¶8.    Investigator Latasha Holmes from the HCSO testified that at approximately 2:30 a.m. on May 18, 2017, she was notified that a child was kidnapped from the Kroger parking lot. Investigator Holmes called the Mississippi Bureau of Investigation (MBI) to report the incident.  Eventually, MBI took over the case.  After Archie was able to provide her car tag number, MBI issued an Amber alert for Kingston and a BOLO (be on the lookout) for the Honda and the Camry.

¶9.    The Madison County Sheriff's Office (MCSO) dispatch eventually received a 911 call that a Camry was found abandoned on the side of Old Jackson Road in Madison County. MCSO Deputy Joel Evans arrived on the scene and spotted the Camry off to the side of the road with the rear doors open.  Deputy Evans and another deputy approached the vehicle and observed a black juvenile male, later identified as Kingston, in the fetal position on the rear

3

passenger floorboard of the car. Deputy Evans testified that he could see a large amount of blood on the back of Kingston's shirt. The deputies called out to Kingston but received no response. Deputy Evans testified that Kingston's left arm was behind his back. Deputy Evans felt Kingston's arm for a pulse, but he did not find one.

¶10. Dr. Mark LeVaughn, the Chief Medical Examiner for the State of Mississippi, testified that Kingston was shot four times: once in each arm, once in the right eye, and once in the back of the head. Dr. LeVaughn testified that Kingston's cause of death was multiple gunshot wounds, and his manner of death was homicide.

¶11. At approximately 8:00 a.m., law enforcement officers at the "makeshift command post" at Kroger received a call from Honey Ates, Wakefield's aunt. Ates informed the officers that the Honda they were searching for belonged to her but that Wakefield had borrowed the car and was driving it that night. Officers went to Ates's home and interviewed her. Upon interviewing Ates, the officers learned the names of the other suspects: Washington and McBride.

¶12. While the officers were at Ates's home, Wakefield called Ates and told her he was at a home in North Jackson. Officers set up a perimeter down the street from where Wakefield was hiding. Ates assured Wakefield that the police were not going to beat him up, so he exited the house and ran toward a stop sign. Wakefield was arrested at gunpoint.

¶13. MBI officers Captain L.A. Oliver and Sergeant Rusty Clark interviewed Wakefield.

4

Wakefield waived his *Miranda*[1] rights and spoke to the officers without an attorney present. A recording and transcript of the interview were entered into evidence. From the beginning of the interview, Wakefield consistently named McBride as the person who stole Archie's car and killed Kingston. However, Wakefield gave the officers several different versions of the events of that evening and morning. Namely, Wakefield's story changed with respect to his knowledge of what McBride had done. Wakefield finally admitted to the investigators that he lied during the first part of the interview because he was scared, and he explained that he knew he could "be charged with accessory" just for knowing that Kingston was murdered.

¶14. In his final version of the events that night, Wakefield informed the investigators that he had been hanging out with Washington and McBride. Wakefield planned to meet Amos at Kroger to sell him a small amount of marijuana, and Washington and McBride rode with him to the store. Wakefield was driving his aunt's Honda, with Washington in the passenger seat and McBride in the back seat.

¶15. While parked in the Kroger parking lot, they saw Archie pull into the parking lot and get out of her Camry. Wakefield commented that Archie was attractive, and McBride exited the vehicle as if he were there to meet Archie. Archie walked into the store. McBride walked past her car as if he were also going into the store. McBride then returned to Wakefield's car to retrieve his phone and jacket from the back seat. According to Wakefield, McBride said that he was going to steal Archie's car and go to Holmes County. Wakefield

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

stated that he and Washington repeatedly told McBride not to steal the car, but McBride got into the Camry and drove off.

¶16. Wakefield explained that he and Amos realized they were at different Kroger locations, so they agreed to meet at Wendy's on Northside Drive in Jackson. Wakefield left the Kroger parking lot and drove to Wendy's. During his interview, Wakefield informed investigators that McBride was in the Camry and pulled out of the Kroger parking lot behind Wakefield's vehicle. However, Wakefield maintained that the vehicles went in separate directions, and he did not see the Camry again after he left the Kroger parking lot.

¶17. After meeting Amos and selling him the marijuana, Wakefield drove with Washington to a gas station on Hanging Moss Road in Jackson. Wakefield stated that at that point, McBride called Wakefield to say he was going to run out of gas, and he asked Wakefield to come pick him up near Gluckstadt Road in Madison County. McBride then called back and informed Wakefield that Kingston was in the car. Wakefield eventually told investigators that he heard McBride ask Kingston how old he was, and Kingston responded. According to Wakefield, McBride stated that he was "going to off" Kingston, meaning kill him. Wakefield stated that he immediately tried to persuade McBride to drop Kingston off at a gas station, unharmed, and then run. Wakefield said that McBride responded, "All right," and then hung up the phone.

¶18. When McBride called again to say he was out of gas, Wakefield instructed him to leave Kingston at a gas station and run off. Wakefield then told McBride to send his

6

location. McBride sent his location to Wakefield's phone, and Wakefield and Washington picked him up. Wakefield stated that McBride did not tell them he had killed Kingston until they were in the car and about to merge onto the interstate to return to Jackson. Wakefield told investigators, "If I knew he'd killed that baby before I came and got him, I would have never came and got him." McBride told Wakefield and Washington that he had shot Kingston six times. Wakefield stated that he did not know McBride had a gun with him that evening or morning.

¶19. As Wakefield drove Washington and McBride back to Jackson from Madison County, he passed the Kroger on I-55. Wakefield admitted that he saw all the law enforcement officers gathered at the store and he knew that their presence was related to Kingston, but he kept driving. Wakefield stated that he was focused on "getting [McBride] out of [his] car." After dropping McBride off at his mother's home, Wakefield and Washington drove to a neighborhood in Jackson where Washington's brother lived. Wakefield deleted all his text messages.

¶20. Although Wakefield was initially charged with capital murder, he was ultimately indicted for accessory after the fact to murder, accessory after the fact to kidnapping, and accessory after the fact to auto theft. Wakefield was seventeen years old at the time of the crimes, so his case originated in the Madison County Youth Court. The youth court eventually transferred Wakefield's case to the Madison County Circuit Court.

¶21. A trial was held in October 2019. At the trial, the jury heard testimony from Archie,

7

Deputy Myers, Deputy Holmes, Deputy Evans, Sergeant Clark, and Dr. LeVaughn, as well as HCSO criminal investigators Rholonn Tucker, Ve'nesha Blackmon, and Michael Huff; Emily Whitehead, the subpoena-compliance director for Telapex (parent company for C-Spire); Thomas Gandy, the custodian of records for AT&T; Special Agent William Williams with the Federal Bureau of Investigation; and Charles Amos.

¶22. The jury returned a verdict of guilty on all three counts. The circuit court then sentenced Wakefield to serve twenty years in the custody of the MDOC for accessory after the fact to murder; fifteen years in the custody of the MDOC for accessory after the fact to kidnapping, to run consecutively to the twenty-year sentence; and five years in the custody of the MDOC for accessory after the fact to auto theft, with the five-year sentence to run concurrently to the fifteen-year sentence.

¶23. Wakefield filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial. After the denial of his post-trial motion, Wakefield appealed.

## DISCUSSION

### I. Jurisdiction

¶24. Wakefield argues in his pro se appellate brief that the Madison County Circuit Court lacked jurisdiction over his case. Wakefield asserts that because the crimes started in Hinds County, the Hinds County Circuit Court was the only proper venue. Jurisdiction is a question of law, and we therefore apply a de novo standard of review in determining "whether jurisdiction over a particular matter is proper[.]" *Cosby v. State*, 66 So. 3d 161, 165 (¶7)

(Miss. Ct. App. 2010).

¶25.    We recognize that "[w]hen two counties are involved in the commission of a crime, either county is a proper venue." *Burnett v. State*, 876 So. 2d 409, 412 (¶15) (Miss. Ct. App. 2003) (citing Miss. Code Ann. § 99-11-19).  The two statutes relevant to the question of venue are Mississippi Code Annotated section 99-11-3(1) (Rev. 2015) and Mississippi Code Annotated section 99-11-19 (Rev. 2015).  Section 99-11-3(1) provides, in pertinent part: "The local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed."  Section 99-11-19 states:

> When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.

"While the ultimate burden of proving venue that rests upon the State is beyond a reasonable doubt, this is a standard of proof before the jury, not the trial judge." *Hill v. State*, 797 So. 2d 914, 916 (¶11) (Miss. 2001).

¶26.    Wakefield raised the issue of venue in his motion for JNOV or, in the alternative, a new trial.[2]  At a hearing on the motion, the State responded to Wakefield's argument regarding venue and explained that "all of [Wakefield's] action regarding accessory after the fact were here in Madison County[,] in addition to knowing why he was going to help [McBride] when [Wakefield] was at a gas station in Hinds [County]."  The circuit judge

---

[2] The record reflects that Wakefield also raised the issue of venue before trial.

9

ruled that the arguments regarding venue "have been discussed in this courtroom several times prior to the trial[,] [and] I ruled on it. I see no reason to upset that ruling."

¶27. In the present case, we find that the evidence presented at trial sufficiently established that Wakefield committed the crimes at least partly in Madison County. "[I]f there exists sufficient evidence that a portion of the crime occurred in the county where the trial is being held, 'then the evidence of venue is sufficient.'" *Cosby v. State*, 66 So. 3d 161, 165 (¶7) (Miss. Ct. App. 2010) (quoting *Hill*, 797 So. 2d at 916 (¶12)); *see Thorson v. State*, 653 So. 2d 876, 895 (Miss. 1994) (holding that the defendant was subject to prosecution in either of the county's judicial districts where the abduction of the victim was in the first judicial district but the victim's death occurred in the second judicial district). The State presented evidence to show that although McBride stole the car and kidnapped Kingston in Hinds County, Wakefield picked up McBride near Gluckstadt Road in Madison County. The State submitted evidence showing that when Wakefield picked up McBride, he knew McBride had stolen the Camry and kidnapped Kingston in Hinds County and then murdered Kingston in Madison County. Evidence at trial also showed that Wakefield's cell phone utilized towers in Madison County, corroborating his statement that he picked up McBride near Gluckstadt Road.

¶28. After our review, we find that the Madison County Circuit Court had jurisdiction over Wakefield's offenses.

## II. Double Jeopardy

¶29. Wakefield next argues that he was charged with violating the same statute, Mississippi Code Annotated section 97-1-5 (Rev. 2014), three different times in violation of the Fifth Amendment provision of the United States Constitution against double jeopardy. "The Double Jeopardy Clause prevents . . . multiple punishments for the same offense." *Tallant v. State*, 345 So. 3d 575, 589 (¶39) (Miss. Ct. App. 2021), *cert. denied*, 344 So. 3d 278 (Miss. 2022); *see also Dancy v. State*, 287 So. 3d 931, 940 (¶35) (Miss. 2020). "We apply a de novo standard of review to claims of double jeopardy." *Kelly v. State*, 80 So. 3d 802, 804 (¶8) (Miss. 2012). As acknowledged by the State, neither this Court nor the Mississippi Supreme Court has ever decided whether charging someone with multiple felonies under section 97-1-5 violates the Fifth Amendment's prohibition of double jeopardy as applied to the states through the Fourteenth Amendment.

¶30. Wakefield acknowledges that McBride committed three separate felonies in violation of three separate statutes. In contrast, Wakefield argues that he gave McBride only *one* ride after the crimes were committed, rather than committing three "discrete and separate" actions. *See May v. State*, 267 So. 3d 803, 808 (¶18) (Miss. Ct. App. 2018). Wakefield therefore claims that his indictment is multiplicitous. The supreme court has explained that "[a]n indictment is multiplicitous if it charges a single offense in more than one count." *McGlasten v. State*, 328 So. 3d 101, 103 (¶11) (Miss. 2021). "Multiplicitous charges may violate the Fifth Amendment's prohibition against double jeopardy due to the possibility that the defendant will receive more than one sentence for a single offense." *Id.* (internal

11

quotation marks omitted).

¶31. The State agrees that Wakefield gave McBride only one ride, but the State submits that Wakefield's actions after finding out about each of McBride's crimes represent *three* different acts. The State further argues that this Court should find that a person can be properly charged and convicted of multiple felonies under section 97-1-5 when the principal (in this case, McBride) committed multiple felonies, and the State met its burden of proving beyond a reasonable doubt that the accused was an accessory after the fact to each one.

¶32. In the present case, Wakefield was indicted under section 97-1-5 for three separate counts of accessory after the fact for transporting McBride from the scene of the crimes. Pursuant to section 97-1-5, a person is guilty of accessory after the fact if he "concealed, received, or relieved any felon, or … aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or to avoid arrest, trial, conviction or punishment after the commission of the felony. . . ." The indictment charged, in pertinent part, as follows:

> Wakefield . . . did willfully, unlawfully and feloniously receive, relieve, aid and/or assist [McBride] to avoid arrest, trial, conviction or punishment following the commission by [McBride] of the felony crime of [specific crime listed in each individual count] in violation of [specific statute for the crime] . . . in that [Wakefield] . . . transported [McBride] from the scene of the aforesaid crime, then and there knowing that [McBride] had committed said crime, thereby violating [section] 97-1-5[.]

Count I charged Wakefield with accessory after the fact to murder; Count II charged Wakefield with accessory after the fact to kidnapping; and Count III charged Wakefield with

accessory after the fact to auto theft.

¶33.   Wakefield's trial counsel filed a pre-trial motion to merge the counts in the indictment. Wakefield's counsel asserted that all three counts "arise out of the same nucleus of operative fact," and that "everything about each count is identical other than the name of the crime the principal has committed in each particular situation." At the hearing on the motion, the State argued that because each count alleged assistance with a different crime, each count had an element of proof that the other did not. The State maintained that the evidence at trial would show that Wakefield found out about McBride's three separate felonies at three separate times. The State also pointed out that the accessory-after-the-fact statute sets forth different sentences depending on the severity of the underlying crime.

¶34.   After hearing arguments, the circuit court denied Wakefield's motion, explaining that all three counts in the indictment "require a proof of fact or element each that the other one does not, and the Court finds that there's no double jeopardy as such." The circuit court also held that the merger doctrine, "which provides that two independent offenses merge into one only when the greater offense includes all the elements of the lesser," was not violated in this case.

¶35.   The record shows that in denying Wakefield's motion to merge the counts in the indictment, the circuit court utilized the "same-elements" test established by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The *Blockburger* test provides that "where the same act or transaction constitutes a violation of

13

two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Kelly*, 80 So. 3d at 805 (¶11) (quoting *Blockburger*, 284 U.S. at 304). However, because Wakefield's "double jeopardy issue arises from convictions for multiple violations of a single statute"—section 97-1-5—we find that *Blockburger* does not apply. *May*, 267 So. 3d at 808 (¶¶17-18); *see also United States v. Evans*, 854 F.2d 56, 58-59 (5th Cir. 1988) (explaining that the *Blockburger* test does not apply when only one statutory provision is involved).

¶36.    Instead, when a person is charged with multiple violations of a single statutory provision, the Court should look to the "allowable unit of prosecution" under that statute to determine whether a legislature intended the offender's actions to constitute "one or more distinct offenses." *Sanabria v. United States*, 437 U.S. 54, 70 (1978); *Evans*, 854 F.2d at 59. Stated differently, "[w]hether a transaction results in the commission of one or more offenses is determined by whether separate and distinct acts made punishable by law have been committed." *May*, 267 So. 3d at 807 (¶14) (quoting *United States v. Prestenbach*, 230 F.3d 780, 783 (5th Cir. 2000)).

¶37.    Our supreme court recently utilized this analysis in *McGlasten*, 328 So. 3d at 102 (¶2). In that case, the supreme court examined whether the phrase "any firearm" from the felon-in-possession statute means "one firearm," or if it "encompass[es] the possession of multiple guns." *Id.* The supreme court ultimately found the phrase "any firearm" to be ambiguous

as to the allowable unit of prosecution. *Id*. at 106 (¶21). The supreme court explained that because the ambiguity concerned a criminal statute, "the longstanding rule of lenity applies." *Id*. at 106-07 (¶24). "Under the rule of lenity, where a criminal statute is patently ambiguous, it must be interpreted in favor of the accused." *Id*. at 107 (¶25) (internal quotation marks omitted). In applying the rule of lenity to the phrase "any firearm" in the felon-in-possession statute, the supreme court determined that "the simultaneous possession of multiple firearms generally constitutes only one offense under [the statute] unless there is evidence that the weapons were stored in different places or acquired at different times." *Id*. at (¶27) (internal quotation marks omitted). The supreme court recognized, however, that "in states with statutes that use the term '*a* firearm,'" instead of *any* firearm, "courts have found multiple convictions are allowed." *Id*. at 104 (¶15). The supreme court accordingly held that "[b]ecause the State presented evidence that McGlasten possessed the four weapons at the same time in the same small house, his four convictions merge into one count of conviction." *Id*. at 102 (¶4).

¶38. However, "[w]here the State has evidence of multiple instances of a crime, a defendant may be indicted separately for each instance." *Bevalaque v. State*, 337 So. 3d 691, 697 (¶23) (Miss. Ct. App. 2022). In *Tallant*, 345 So. 3d at 589 (¶40), the appellant was charged with three counts of child exploitation based upon evidence of separate text transmissions. The appellant argued that his "multiple texts and multiple pornographic images constituted one offense," and therefore his indictment improperly charged him with

15

separate counts of transmission of child pornography, which resulted in multiple punishments for the same offense. *Id*. at (¶39). This Court examined the statute at issue, Mississippi Code Annotated section 97-5-33 (Supp. 2007), which stated that "[n]o person shall, by any means including computer, knowingly send, transport, transmit, ship, mail or receive *any* photograph, drawing, sketch, film, video tape or other visual depiction of an actual child engaging in sexually explicit conduct." *Id*. at (¶40) (emphasis added). In examining the statutory language, this Court distinguished the facts in *Tallant* from those in *McGlasten*:

> The criminal act defined by the statute in *McGlasten* was the single possession of firearms. Clearly more than one "possession" (e.g., weapons acquired at different times or stored in different locations) would support separate indictments. But the criminal act in the statute in Tallant's case is the transmission, not possession, of images of child pornography. Tallant's indictment charged him with three separate counts of transmitting child pornography.

*Id*. at 589 n.10. This Court found that "[b]y using the word 'any' in describing the types of items one can potentially distribute, this statute criminalizes the transmission of even a single photograph, drawing, sketch, film, video tape or other visual depiction." *Id*. at 589 (¶40). Therefore, "transmitting a single photograph or a single message constitutes a single offense under section 97-5-33." *Id*. Upon review, this Court found that Tallant's indictment was not improper because it charged him with the three separate transmissions of sending multiple images of child pornography over a period of time, and "each transmission was a separate offense for which Tallant was separately indicted and to which he separately pleaded guilty." *Id*. This Court further held that because Tallant was charged with distinct and separate

16

offenses, his indictment was not multiplicitous. *Id*. at 591 (¶44).

¶39.   Here, however, Wakefield maintains that he only committed one action, and as a result, the State improperly multiplied Wakefield's one action by charging him with violating the same statute three separate times.  Wakefield cites *May*, 267 So. 3d at 808 (¶19), in support of his argument.  In *May*, the appellant was convicted of two counts of aggravated assault against the same woman during the same incident – one count for causing serious bodily injury to the victim by striking her in the face and head, and one count for causing bodily injury to the victim by strangling her. *Id*. at 807 (¶12).  This Court found that because "May was not charged under a separate statute with differing elements of proof[,] . . . the same-elements test [under *Blockburger*] is inapplicable." *Id*. at 808 (¶18).  In its analysis, this Court recognized that "[w]hether a transaction results in the commission of one or more offenses is determined by whether separate and distinct acts made punishable by law have been committed." *Id*. at 807 (¶14).  Upon review, this Court found that May's "actions were not each a discrete and separate act but a part of May's single attack on [the victim], i.e., one aggravated assault." *Id*. at 808 (¶18).  Because "the right to protection from double jeopardy" precluded May's second aggravated assault conviction, this Court vacated the second conviction. *Id*. at (¶19).

¶40.   Turning to the case before us, section 97-1-5(1) defines an accessory after the fact as one who "concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or

17

to avoid arrest, trial, conviction or punishment after the commission of the felony." The State argues that based on this wording, each felony is a single unit of prosecution, so an offender can be charged separately for each distinct felony. We agree. A reading of section 97-1-5(1) shows that this statute criminalizes the act of assisting any felon, while "knowing that the person had committed *a* felony." (Emphasis added). Based on this wording, we find that each felony constitutes a separate unit of prosecution, and therefore allows for multiple convictions under the statute. *See McGlasten*, 328 So. 3d at 104 (¶15). Additionally, the accessory-after-the-fact statute sets forth different punishments for an accessory after the fact based on the severity of the underlying felony committed by the principal. *See* Miss. Code Ann. § 97-1-5(1)(a)-(b). In Wakefield's specific case, the merger doctrine could not apply.

¶41. Although Wakefield only gave McBride one ride, the State presented evidence to show that McBride committed multiple felonies and that Wakefield was an accessory after the fact to each felony. The State also presented evidence showing that Wakefield learned about each of McBride's separate felonies at three separate times. Cell phone records and surveillance footage placed the Honda in the Kroger parking lot at approximately 1:00 a.m. Approximately fifteen minutes later, Wakefield drove off in the Honda, and McBride drove off in Archie's Camry. Cell phone records showed that phone calls were made between Wakefield and McBride beginning at 1:19 a.m.

¶42. Wakefield told investigators that while he was at a gas station in Jackson, McBride called to say that he was going to run out of gas, and he asked Wakefield to pick him up near

18

Gluckstadt Road in Madison County. Cell phone records first placed McBride in Gluckstadt at approximately 1:36 a.m. Evidence showed that during this time, Wakefield and Washington were still in Jackson. Wakefield stated that McBride then called back, and at this point, Wakefield learned that Kingston was in the car.

¶43. Evidence showed that McBride's phone first utilized the cell phone tower in Gluckstadt that serviced the crime scene at approximately 2:09 a.m. When McBride called Wakefield to say he was out of gas, Wakefield instructed McBride to send his location. Wakefield told investigators that McBride sent his location to Wakefield's phone, and Wakefield then chose to drive to Gluckstadt and pick him up. Cell phone records show that McBride made phone calls to Wakefield from Gluckstadt at 2:09 a.m., 2:19 a.m., and 2:23 a.m. Cell phone records first placed Wakefield in Gluckstadt at approximately 2:19 a.m. Records showed that the 2:19 a.m. phone call was the last phone call that could be mapped for Wakefield until much later in the morning, and McBride's 2:23 a.m. phone call was the last call that could be mapped from McBride's cell phone until much later in the morning. Wakefield told investigators that McBride did not tell him that he had killed Kingston until McBride was in the Honda and they were about to merge onto the interstate.

¶44. After our review, we find that Wakefield's indictment was not multiplicitous. Accordingly, Wakefield's convictions for three counts of accessory after the fact under section 97-1-5 and resulting sentences did not violate his protection against double jeopardy.

III.   Sufficiency of the Evidence

19

¶45. Wakefield also asserts that the evidence is insufficient to support the guilty verdicts on each of the three counts in the indictment. Specifically, Wakefield argues that the State failed to prove that Wakefield acted with the intent to allow McBride to avoid arrest or punishment when he drove McBride to McBride's mother's home. Wakefield further argues that the State failed to prove that Wakefield knew that McBride had killed Kingston when he picked up McBride in Madison County. Although Wakefield challenges all three convictions, his argument focuses specifically on his conviction for accessory after the fact to murder.

¶46. Wakefield first challenged the sufficiency of the evidence against him in his motion for a directed verdict, which the circuit court denied. He again challenged the sufficiency of the evidence, as well as the weight of the evidence, in his post-trial motion for a JNOV or, in the alternative, a new trial. In denying Wakefield's motions, the circuit court found that "when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt and thus the evidence was legally sufficient." The circuit court also held that "to allow the verdict to stand would not sanction an unconscionable injustice, thus the verdict was not against the overwhelming weight of the evidence."

¶47. When reviewing a challenge to the sufficiency of the evidence, we apply a de novo standard of review. *Thompson v. State*, 302 So. 3d 1230, 1233 (¶6) (Miss. Ct. App. 2020) (citing *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018)). We view "the evidence

20

in a light most favorable to the State to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Thames v. State*, 310 So. 3d 1163, 1174 (¶53) (Miss. 2021) (internal quotation marks omitted). "All favorable inferences reasonably drawn from the evidence go to the benefit of the State." *Id*. We have held that "[t]he issue is not whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Thompson*, 302 So. 3d at 1233 (¶6).

¶48. Here, the indictment charged Wakefield with three counts of being an accessory after the fact. Accessory after the fact contains the following elements:

> (1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony; and (3) such aid or assistance was rendered with the intent to enable the felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.

*Thames*, 310 So. 3d at 1174 (¶55); *accord* Miss. Code Ann. § 97-1-5. Wakefield contends that the State failed to prove that he acted with the intent to help McBride avoid arrest, trial, conviction, or punishment for the crimes. Wakefield maintains that all he did was give McBride a ride from the scene of the crime to his mother's home; he did not hide McBride, destroy or hide evidence, lie to the police on McBride's behalf, or provide any other assistance that would have enabled McBride to avoid arrest or prosecution.

¶49. As stated, we must consider as true all evidence consistent with Wakefield's guilt, and the State must be given the benefit of all reasonable inferences that can be drawn from the

evidence. Here, the State presented the jury with the video and transcript of Wakefield's interview with the police. Wakefield stated that he watched McBride steal the Camry, and he told investigators that McBride called him after stealing the Camry and informed him that Kingston was in the car. Wakefield also told investigators that McBride said he was "going to off" Kingston, meaning kill him. Wakefield stated that he urged McBride to drop Kingston off somewhere, unharmed, and Wakefield told McBride that he would come and get him. The State also presented evidence of cell phone site data confirming that Wakefield was communicating with McBride after McBride stole the Camry. Wakefield admitted to investigators that he drove to Madison County to pick up McBride. When McBride told Wakefield that he had murdered Kingston, Wakefield did not call the police. Instead, he aided McBride in escaping the crime scene and helped him avoid arrest by driving him to his mother's home. During the interview, Wakefield admitted to investigators that when he was driving McBride to the house after the murder, he saw the law enforcement officers gathered at the Kroger in Jackson and that he knew the law enforcement presence was related to Kingston. However, Wakefield continued driving past the store and took McBride to his mother's home.

¶50.    In *Thompson*, 302 So. 3d at 1234 (¶9), this Court found that the evidence at trial was sufficient to support a conviction for accessory after the fact to murder where the evidence showed that the defendant knew her friends had killed the victim, and the defendant still rendered aid to help her friends avoid arrest by transporting them to a safe house. Similarly,

22

in the case before us, we find that the evidence against Wakefield was sufficient for a rational juror to find that he intended to help McBride escape and avoid arrest for three felonies.

¶51.    Wakefield also argues that the State failed to prove that Wakefield knew that McBride had killed Kingston at the time he picked up McBride in Madison County. Wakefield's indictment charged him as an accessory after the fact to the murder of Kingston by aiding or assisting McBride "to avoid arrest, trial, conviction or punishment" after McBride murdered Kingston by transporting McBride from the scene of the crime while "knowing that [McBride] had committed said crime."

¶52.    As to the element of knowledge, the supreme court has stated:

> To render one liable as an accessory after the fact he must have had actual knowledge, at the time he relieved or assisted the principal, that the latter had committed a felony, or was an accessory before the fact to a felony; and such knowledge must be personal as distinguished from constructive.

*Thames*, 310 So. 3d at 1174 (¶55); *accord* Miss. Code Ann. § 97-1-5. Because murder was the underlying offense to Wakefield's charge of accessory after the fact, "the State was required to prove that the victim was dead at the time [Wakefield] committed any acts of assistance and that [Wakefield] knew so." *Thames*, 310 So. 3d at 1175 (¶64). The State presented evidence of Wakefield admitting to investigators that McBride told him that he planned to "off" Kingston. Wakefield insisted that he tried to convince McBride not to harm Kingston. Wakefield told investigators that he picked up McBride in Madison County, and when McBride got into the car, he told Wakefield, "Let's go. Let's go. We have got to go." Wakefield stated that "[r]ight before we g[o]t on the highway," McBride told Wakefield and

23

Washington that he had shot Kingston six times. Another time during the interview, Wakefield stated that McBride "said it when he got in the car." Wakefield was adamant that if he knew that McBride had killed Kingston, he never would have gone to Madison County to pick up McBride. Wakefield told investigators that while driving McBride from the crime scene to his home, he drove past Kroger and saw law enforcement gathered, but he kept driving until he reached McBride's mother's home.

¶53. "The jury is the sole judge of the credibility of witnesses." *McDaniel v. State*, 290 So. 3d 1286, 1292 (¶17) (Miss. Ct. App. 2020). "The jury is charged to listen to the evidence, observe the demeanor of the witnesses, and decide this issue of the credibility of the witnesses and what weight to give to any particular piece of evidence." *Id*. at 1293 (¶17). In the case before us, the jury watched the video of Wakefield's interview with the investigators, and the transcript from the interview was admitted into evidence. Prior to deliberating, the jury was instructed on the elements of accessory after the fact to murder. Specifically, the jury was instructed that in order to find Wakefield guilty of accessory after the fact to murder, the jury "must be convinced from the evidence beyond a reasonable doubt" that McBride committed a murder and that Wakefield, while "knowing that McBride had committed the felony of murder," "concealed, received, relieved, aided or assisted" McBride "by transporting McBride from the scene of the murder . . . with the intent to help McBride escape or avoid arrest, trial, conviction[,] or punishment" for committing murder.

¶54. After our review, we find that the State presented sufficient evidence for a rational

24

juror to conclude that "at the time [Wakefield] relieved or assisted [McBride]," he had actual, personal knowledge that McBride killed Kingston. *Thames*, 310 So. 3d at 1174 (¶55). Furthermore, in viewing all the evidence presented at trial in the light most favorable to the State, we find that the evidence was sufficient such that any rational juror could have found Wakefield guilty of acting as an accessory after the fact to murder, to kidnapping, and to auto theft beyond a reasonable doubt.

### IV. Weight of the Evidence

¶55. In addition to the sufficiency of the evidence, Wakefield submits that his convictions are against the overwhelming weight of the evidence. In support of this assignment of error, Wakefield restates his argument that the evidence does not support a finding that he "acted with knowledge that McBride committed felonies in an effort to enable him to avoid arrest or prosecution."

¶56. "A challenge to the weight of the evidence is separate and distinct from a challenge to the legal sufficiency of the evidence." *Fontaine v. State*, 256 So. 3d 615, 627 (¶42) (Miss. Ct. App. 2018). "When reviewing a challenge to the weight of the evidence, this Court views the evidence in a light most favorable to the verdict." *Thames*, 310 So. 3d at 1174 (¶54). We will only disturb a verdict when it "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*.

¶57. As discussed, the State presented sufficient evidence for a rational juror to find Wakefield guilty of accessory after the fact to murder, to kidnapping, and to auto theft

beyond a reasonable doubt. Considering the evidence presented at trial, we do not find the verdict to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. Accordingly, the circuit court did not abuse its discretion by denying Wakefield's motion for a new trial. *See Fontaine*, 256 So. 3d at 627 (¶43).

## V. Defective Indictment

¶58. Wakefield next argues that his indictment omitted an essential element in each of the three counts: intent. Wakefield submits that because the indictment did not properly charge him with all the elements of the crime, the indictment was defective and must be dismissed.

¶59. "Whether an indictment is fatally defective is a question of law, which this [C]ourt reviews de novo." *Spearman v. State*, 80 So. 3d 116, 119 (¶12) (Miss. Ct. App. 2011). We recognize that "[a]n indictment must contain (1) the essential elements of the offense charged, (2) sufficient facts to fairly inform the defendant of the charge against which he must defend, and (3) sufficient facts to enable him to plead double jeopardy in the event of a future prosecution for the same offense." *Id*. "So long as from a fair reading of the indictment, taken as a whole, the nature and cause of the charge against the accused are clear, the indictment is legally sufficient." *Davis v. State*, 171 So. 3d 537, 540 (¶11) (Miss. Ct. App. 2015)).

¶60. Wakefield was charged with three counts of accessory after the fact, which consists of the following elements:

(1) a completed felony has been committed; (2) the accused concealed, received, relieved, aided or assisted a felon, knowing that such person had committed a felony; and (3) such aid or assistance was rendered with the intent to enable the felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony.

*Thames*, 310 So. 3d at 1174 (¶55); *accord* Miss. Code Ann. § 97-1-5. Wakefield's indictment alleged:

[Wakefield] . . . did willfully, unlawfully and feloniously receive, relieve, aid and/or assist [McBride] to avoid arrest, trial, conviction or punishment following the commission by [McBride] of the felony crime of the Murder of Kingston Frazier, in violation of [section] 97-3-19 . . . in that [Wakefield,] along with [Washington], transported [McBride] from the scene of the aforesaid crime, then and there knowing that [McBride] had committed said crime, thereby violating [section] 97-1-5[.]

Counts II and III used the same language and format but charged accessory after the fact to kidnapping and auto theft, respectively.

¶61. Wakefield asserts that each count of the indictment attempts to charge him with accessory after the fact to a felony, but he maintains that each count of the indictment fails to allege the essential element of the crime that Wakefield acted "with the intent to enable such felon to escape or avoid arrest, trial, conviction or punishment after the commission of such felony." Wakefield raised his claim of defective indictment before the circuit court, but the circuit court denied his motion to dismiss the indictment, holding that the inclusion of the words "willfully and unlawfully and feloniously" was sufficient to charge the allegedly missing "intent" element.

¶62. In *Lyles v. State*, 12 So. 3d 532, 539 (¶21) (Miss. Ct. App. 2009), this Court addressed

a similar argument. There, the defendant argued that his indictment was fatally defective for failing to allege an essential element of the charged crime—intent. *Id*. This Court stated that "[w]hile the word 'intent' is not specifically used in [the] indictment, it does contain the term 'wilfully.'" *Id*. This Court recognized the supreme court's holding that the terms "willfully," "knowingly," and "intentionally" were "considered to be interchangable." *Id*. (citing *Moore v. State*, 676 So. 2d 244, 246 (Miss. 1996)). This Court further explained that "'wilful' means nothing more than doing an act intentionally." *Id*. Ultimately, this Court found the indictment was sufficient to provide the appellant notice of the charge against him. *Id*. at 540 (¶22).

¶63. Similar to *Lyles*, we find that although Wakefield's indictment did not contain the term "intent," his indictment did contain the term "willfully," which was sufficient to provide him with notice of the charges against him. Additionally, Wakefield "has not identified any prejudice in the presentation of his defense resulting from the wording in the indictment." *Id*. We find no merit to this issue.

## VI. Autopsy and Crime Scene Photographs

¶64. Finally, Wakefield argues that the circuit court erred in admitting four photographs into evidence: one photograph of Kingston's body on the floorboard of the Camry and three photographs from Kingston's autopsy. Wakefield asserts that the photographs were more prejudicial than probative and that the photographs did not aid the jury in determining whether Wakefield was an accessory after the fact to McBride's crimes. Rather, Wakefield

argues that the photographs served to inflame the passions of the jury. Wakefield maintains that the admission of the photographs denied him a fair trial.

¶65. The State argues that the four photographs admitted into evidence have probative value. The State asserts that the autopsy photographs aided Dr. LeVaughn's testimony that Kingston died of multiple gunshot wounds. Additionally, Deputy Evans testified that when he approached the Camry, Kingston's dead body was in plain view in the backseat. The State maintains that the crime scene photograph aided Deputy Evans's testimony describing the location of Kingston's body when it was found. The State had to prove the underlying felony of murder to meet its burden of proving that Wakefield knowingly acted as an accessory after the fact to murder, and the State argues that the photographs helped the State prove the murder.

¶66. The exclusion of relevant evidence is governed by Mississippi Rule of Evidence 403, which states that the circuit court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403. "Admission of photographs by the trial court is reviewed for abuse of discretion." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Chamberlin v. State*, 989 So. 2d 320, 340 (¶73) (Miss. 2008)). With regard to the admissibility of photographic evidence, the circuit judge's discretion is "almost unlimited," and we will not disturb "a decision favoring admissibility . . . absent a clear abuse of that

judicial discretion." *Id*. "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Id*. "So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory." *Id*. The supreme court has held that "[p]hotographs have evidentiary value where they: 1) aid in describing the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; and 3) where they supplement or clarify witness testimony." *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995) (citations omitted).

¶67. At trial, the defense objected to the four photographs submitted by the State, arguing that they had no probative value and could only prejudice and inflame the jury. After hearing arguments, the circuit court admitted the photographs into evidence. With regard to the three autopsy photographs, the circuit court ruled that "the introduction of those pictures would not be more inflammatory than necessary[,] and . . . they are more probative than prejudicial." The circuit court acknowledged that the State had the burden of proving the underlying felony of murder. The circuit court also found that the photographs were not "overly egregious" and were "discreet."

¶68. After our review, we find that the circuit court did not abuse its discretion in admitting the four photographs into evidence. The trial transcript shows that the circuit court applied the Rule 403 test to each of the photographs and determined that the probative value was not

substantially outweighed by the danger of unfair prejudice. The circuit court noted that the State had to prove the underlying murder occurred in order to prove that Wakefield was an accessory after the fact to murder. As asserted by the State, the photographs aided testimony about the cause of death and the location of Kingston's body when it was found. The photograph from the crime scene does not show Kingston's face, head, gunshot wounds, or excessive blood. The autopsy photographs show Kingston's clean body with no blood. Based on the foregoing, the circuit court did not abuse its discretion in finding that the photographs provided evidentiary value and were admissible under Rule 403. Additionally, we find no evidence to support Wakefield's claim that the photographs were used to inflame the passions of the jury.

## CONCLUSION

¶69. After our review, we find no reversible error. We therefore affirm Wakefield's convictions and sentences.

¶70. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., NOT PARTICIPATING.**

31